THE HONORABLE RICHARD A. JONES

1
2
3
4
5
6
7
8
9

# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ABRAHAM LEAVITT,<br>                    *Plaintiff*,<br><br>             vs.<br><br>CENTRAL CREDIT, LLC,<br>                    *Defendant*. | Case No. 2:23-cv-01817-RAJ<br><br>**Amended Complaint**<br><br>**Violations of the federal Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*., and**<br><br>**Violations of the Washington Fair Credit Reporting Act, RCW § 19.182.005 *et seq*.**<br><br>*[Jury Trial Demanded]* |

Plaintiff Abraham Leavitt brings this action against Defendant Central Credit LLC ("Defendant" or "Central Credit"), based upon personal knowledge, upon information and belief where applicable, and upon the investigation of counsel.  The action arises under both the federal Fair Credit Reporting Act ("FCRA") and the Washington Fair Credit Reporting Act ("WFCRA"), statutes enacted by the U.S. Congress and the Washington Legislature to protect consumers from abuses of power in the credit-reporting process, abuses that harm both consumers and the businesses that rely upon credit reporting.

# CONTENTS

NATURE OF THE CASE ............................................................................................ 4

PARTIES TO THE ACTION ...................................................................................... 5

JURISDICTION & VENUE ....................................................................................... 5

FACTUAL ALLEGATIONS ...................................................................................... 6

I.    FAILURE TO REASONABLY INVESTIGATE DISPUTED CREDIT REPORTING, 15 U.S.C. § 1681I(A)(1) ....................................................................................... 6

    A.    Consumer ........................................................................................... 7

    B.    Consumer Reporting Agency .......................................................... 7

    C.    Inaccurate Information in Consumer File ..................................... 8

    D.    Direct Notification of Dispute ...................................................... 10

    E.    Failure to Reasonably Investigate Inaccuracy ......................... 13

    F.    Willful Failure ................................................................................ 14

    G.    Negligent Failure (in the alternative) ......................................... 15

    H.    Actual Damages .............................................................................. 15

II.    FAILURE TO NOTIFY CONSUMER OF RIGHT TO KNOW PROCEDURES USED AND OF RIGHT TO INCLUDE STATEMENT OF DISPUTE, 15 U.S.C. § 1681I(A)(6)(B)(III)-(IV) ......................... 16

    A.    Consumer ......................................................................................... 17

    B.    Consumer Reporting Agency ........................................................ 17

    C.    Inaccurate Information in Consumer File ................................... 18

    D.    Direct Notification of Dispute ...................................................... 19

    E.    Failure to Notify Consumer of Rights to Know Investigation Procedure .......... 20

    F.    Willful Failure ................................................................................ 22

    G.    Negligent Failure (in the alternative) ......................................... 25

    H.    Actual Damages .............................................................................. 25

III.    FAILURE TO REASONABLY INVESTIGATE DISPUTED CREDIT REPORTING, RCW 19.182.090(1), AND TO PROVIDE NOTICE OF ABILITY TO PROVIDE STATEMENT OF DISPUTE, RCW 19.182.090(8)(B)(V) ......................................... 28

A.    Unfair and Deceptive Practice ............................................................. 28

      i.    Consumer ............................................................................ 28

      ii.    Consumer Reporting Agency ............................................ 29

      iii.    Inaccuracy of Information in Consumer's File ................. 29

      iv.    Direct Notification of Dispute ......................................... 29

      v.    Failure to Reasonably Investigate Inaccuracy ................. 29

      vi.    Failure to Provide Notice of Right to Provide Statement of Dispute ...... 30

      vii.    Willful Failure .................................................................. 30

      viii.    Negligent Failure (in the alternative) .............................. 30

B.    Occurring in Trade or Commerce ......................................................... 30

C.    Adverse Public-Interest Impact ............................................................ 31

D.    Injury to Business or Property .............................................................. 32

E.    Causation of Injury ............................................................................... 33

PRAYER FOR RELIEF ............................................................................................. 33

JURY DEMAND ........................................................................................................ 33

CERTIFICATE OF SERVICE .................................................................................... 34

1

**NATURE OF THE CASE**

2    1.    An error in a credit report can seem like a minor bureaucratic matter.  It's not.  Often, errors

3    in credit reporting have devastating consequences and, worse, when those affected try their

4    level best — to the point of exasperation and frustration — to rectify the error out of court,

5    the consumer-reporting agencies do little to assist them, let alone fulfill their statutory

6    obligations to consumers and the users of the credit reports to keep them accurate.  Instead,

7    they all too often make the business decision that rank unlawfulness and lack of compliance

8    with Congress' creation of civil rights for citizens is more profitable — and so leave citizens

9    with no other place to go than court.  As the Supreme Court has recently and eloquently put

10    it, credit reporting (often more colloquially referred to by its numerical representation as a

11    credit score) has a big impact upon us: "A credit report can determine everything from whether

12    a person can secure a credit card, purchase a home, win a new job, or start a small business.

13    Recognizing the importance of accuracy in credit reporting, Congress adopted the Fair Credit

14    Reporting Act in 1970 (FCRA)."  *E.g.*, *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,

15    144 S. Ct. 457, 464 (2024); *id.* at ("Mistakes like these can lead lenders to insist on higher

16    interest rates or other terms that make it difficult or impossible for consumers to obtain a

17    mortgage, auto loan, student loan, or other credit."); *see also Jaras v. Equifax Inc.*, 766 F.

18    App'x 492, 496 (9th Cir. 2019) (Berzon, J. dissenting) ("Given their ubiquity and importance

19    in modern life—in employment decisions, in loan applications, in home purchases, and much

20    more—the real-world implications of material inaccuracies in [credit] reports seem patent on

21    their face. That is because the threat to a consumer's livelihood is caused by the very existence

22    of inaccurate information in his credit report and the likelihood that such information will be

23    important to one of the many entities who make use of such reports." (cleaned up)).

24    2.    This case involves credit-reporting in the context of the casino, gambling, and gaming

25    industry.  Yet, it nonetheless reflects a common feature of credit-reporting disputes: a willful

and reckless failure by the credit-reporting agency, Defendant Central Credit LLC here, to take seriously its obligations to try to get the information on file correct when a consumer puts in the time to do so (often after, as here, facing significant professional and personal consequences). Moreover, it also involves a rank failure to notify consumer's of their rights —in a manner that Congress has expressly dictated and required in plain language for decades —in a manner that would avoid many credit-reporting disputes. This is profoundly wrongful conduct. It was profoundly harmful for Mr. Leavitt —and likely many others. It should never have occurred.

## PARTIES TO THE ACTION

3. *Plaintiff Abraham Leavitt*: Plaintiff Abraham Leavitt is a natural person and a citizen of the State of Washington.

4. *Defendant Central Credit, LLC*: Defendant Central Credit is a Delaware-incorporated limited liability company with a principal place of business in Las Vegas, Nevada. Central Credit is a wholly-owned subsidiary of Everi Holdings, Inc.

## JURISDICTION & VENUE

5. *Subject-Matter Jurisdiction*: This Honorable Court has federal-question jurisdiction over this civil action. The FCRA claims arise under federal statutes, giving this Court federal-question jurisdiction over them. *See* 28 U.S.C. § 1331. The WFCRA claims are sufficiently related in fact for the Court to exercise supplemental jurisdiction over these related state-law claims. *See* 28 U.S.C. § 1367(a). Accordingly, the Court has, and can exercise, subject-matter jurisdiction over all claims in suit.

6. *Personal Jurisdiction*: This Honorable Court has personal jurisdiction over Defendant Central Credit LLC. Central Credit has submitted to the personal jurisdiction of this Court by

operation of Rule 12(h) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 12(h)(1)(A)-(B). Moreover, even if Central Credit had not so submitted, it is subject to the claim-specific jurisdiction of the Superior Courts of Washington because Plaintiff's injury occurred in Washington state. *See Lewis By and Through Lewis v. Bours*, 119 Wn.2d 667, 835 P.2d 221 (1992) ("Generally, when an injury occurs in Washington, it is an inseparable part of the 'tortious act' and that act is deemed to have occurred in this state for the purposes of the long-arm statute[.]"). Therefore, pursuant to Rule 4(k)(1)(A) and Rule 4(d) of the Federal Rule of Civil Procedure, this Court has jurisdiction over based upon service thereof.

7.   <u>Venue</u>: This Honorable Court is a proper venue for this action. Central Credit has submitted to the personal jurisdiction of this Court by operation of Rule 12(h) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 12(h)(1)(A)-(B). Moreover, even if Central Credit had not so submitted, a substantial part of the events or omissions giving rise to the claims in suit occurred in this judicial district, making this judicial district convenient. *See* 28 U.S.C. 1391(b)(2).

## FACTUAL ALLEGATIONS

### I.   FAILURE TO REASONABLY INVESTIGATE DISPUTED CREDIT REPORTING, 15 U.S.C. § 1681i(a)(1)

8.   Defendant has violated the federal Fair Credit Reporting Act ("FCRA"), 16 U.S.C. § 1681 *et seq.*, by virtue of its failure to conduct a reasonable investigation of factually and materially inaccurate, misleading, incorrect, and incomplete information in its own credit reports that can and did affect credit-making decisions for Plaintiff by third-party users of Defendant's inaccurate credit reports. Insofar as Defendant attempted to block Plaintiff from making a dispute and also did not make basic inquiries as to the dispute, it did so willfully.

### A. Consumer

9. Mr. Leavitt is a "consumer," as defined by the FCRA. Specifically, the FCRA defines a "consumer" to mean an "individual." 15 U.S.C. § 1681a(c). Mr. Leavitt fits the bill. He is a natural, individual human being—not an artificial person such as a corporate or limited-liability entity. As an individual natural person, Mr. Leavitt is the type of person within the ambit of the FCRA's protections, that FCRA was intended to protect, and is imbued with statutory authority to bring civil actions for noncompliance with the FCRA's provisions. *See* 15 U.S.C §§ 1681n, 1681o.

### B. Consumer Reporting Agency

10. Central Credit, LLC, is a "consumer reporting agency," as defined by the FCRA. Specifically, the FCRA defines a "consumer reporting agency" (or "CRA") to mean "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

    a. Central Credit is a person. In legal contexts, as here, the word "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. Central Credit is Delaware-incorporated corporation and company and, as such, is a person as that term is understood under the law.

    b. A substantial part of Central Credit's business is the assembly or evaluation of credit information on consumers. Specifically, for decades, Central Credit has been providing computerized consumer reporting regarding the creditworthiness of casino

clients and casino patrons.  Central Credit assemblies the information by acting as a data purchaser from other CRAs, such as Experian and TransUnion.  Information collected includes bankruptcy, assets, income, debts, *etc.*  Then, Central Credit evaluates the information itself that it assembles and then produces consumer reports on these consumers.

c.   Central Credit assembles and collects this information for the purpose of providing this information to third parties.  It does not do so solely for its own internal acquisition and retention of the information.  Rather, it's business strategy and structure is the provision of this information to third parties, like casino and other gambling operations.

d.   Central Credit does not do so for free.  Rather, as discovery will demonstrate, it charges some form of payment or monetary dues for its credit reports.

e.   Central Credit uses a means and facility of interstate commerce in providing these materials.  For example, as discovery will demonstrate, Central Credit uses the Internet and interstate telephones to both arrange for, assemble, evaluate, create, and distribute its credit reports.  Thus, Central Credit is a consumer reporting agency as that term is defined in the FCRA.

**C.   Inaccurate Information in Consumer File**

11.   Central Credit placed inaccurate and/or incomplete information in Plaintiff's credit file or credit report.  Specifically, Plaintiff was gaming at two casino or gaming locations located in the Bahamas.  Although Plaintiff incurred gaming debts while gaming there, Plaintiff paid them off in their entirety through a combination of cash and gambling chips before leaving these gaming locations each time.  The locations in the Bahamas used a tablet computer, somewhat like an iPad, to register the payment and that payment was so registered in that

manner before Plaintiff left.  So, although debts were incurred at these gaming locations, they were immediately paid off in full, fully satisfied, and was not owed as such.  Nonetheless, Central Credit included they amounts on its version of Plaintiff's credit report as an unpaid gambling debt.  Because it reported these amounts as unpaid gambling debt when they were, in fact, fully paid and fully satisfied, Central Credit's consumer report on Plaintiff contained inaccurate and incomplete information.   Moreover, because these were significant and material amounts that were falsely, incorrect, inaccurate, and incompletely reported as not paid off in full, these had a significant and material impact upon the view of the credit reporting.   Central Credit included this false — and materially and significantly false — information in its consumer reports on Plaintiff and then distributed them on various occasions, including on or around October 15, 2023, to a number of gaming locations including MGM Casino Properties, Station Casino Properties, Caesars Entertainment Properties, and other casino, gambling, and gaming establishments – as to be determined in discovery.   These inaccuracies can and did affect credit decisions because they showed massive arrears on debt when, in fact, those debts had been paid in full almost immediately after they were incurred.  In short, there was blatant factual inaccuracy of the kind that can and did profoundly affect credit decisions, as detailed further below.

    a.  Specifically there were two casinos at issue that were reporting false information: **(1)** Atlantis at Paradis Bahamas (which operates the Brookfield Hospitality Properties LLC and which falsely reported a $75,000 unpaid loan that was in fact paid but was falsely posted to his credit report on October 13, 2023) and **(2)** Baha Mar Casino (which false reported that gaming debts summing to $110,000 from line items of $10,000; $50,000; $16,000; $14,000; and $20,000; posted to his account on November 13, 2023).

1

2

3

4

5

6

7

     b.  A true and correct screenshot of the portion of the Central Credit report showing the false reporting is show as follows (with the red lines showing the negative line items and the "BAL" or "balance" section showing how much was falsely stated to be unpaid by the two casinos at issue, *i.e.*, Baha Mar and Atlantis at Paradis Bahamas, and, importantly, these are the _only_ negative reporting accounts on Mr. Leavitt's credit report that was prepared by Central Credit[1]:

8

9

10

11

12

13

14

15

16

17

| C16 | BAHA MAR | | | D | #199005 | |
|---|---|---|---|---|---|---|
| | EST | 03/12/2023 | 100,000.00 LT | HI | 09/11/2023 | 110,000.00 |
| | TTO | 09/11/2023 | 110,000.00 | LA | 11/13/2023 | 20,000.00 |
| | INQ | 11/13/2023 | | UDA | 11/22/2023 | 110,000.00 |
| | CUPD | 08/29/2023 | | BAL | 11/22/2023 | 110,000.00 |

$10,000.00 A/C 11/01/2023 Posted 11/13/2023
$50,000.00 A/C 11/01/2023 Posted 11/13/2023
$16,000.00 A/C 11/01/2023 Posted 11/13/2023
$14,000.00 A/C 11/01/2023 Posted 11/13/2023
$20,000.00 A/C 11/01/2023 Posted 11/13/2023

Memo
CR SUSP 10/13/2023

| C26 | ATLANTIS AT PARADISE BAHAMAS | | | D | #8964850 | |
|---|---|---|---|---|---|---|
| | EST | 03/10/2023 | 50,000.00 LT | HI | 09/09/2023 | 75,000.00 |
| | TTO | 09/08/2023 | 75,000.00 | LA | 09/09/2023 | 25,000.00 |
| | INQ | 10/13/2023 | | UDA | 11/22/2023 | 75,000.00 |
| | CUPD | 08/23/2023 | | BAL | 11/22/2023 | 75,000.00 |

$75,000.00 A/C 10/13/2023 Posted 10/13/2023

18

19

**D.**    **Direct Notification of Dispute**

20

21

22

23

24

25

26

12.  On or around, October 28, 2023, Plaintiff notified Central Credit regarding the inaccurate and incomplete information.  Plaintiff informed Central Credit that this information was false and requested that Central Credit correct this information by removing the non-payment and falsely reported debt from his gaming credit report.  As Plaintiff will show, he made multiple communications requesting correction.  By personally initiating these communications and being involved in all of them, Plaintiff communicated these directly, using his emails, *etc.*

27

28

---

[1] The full credit report is _not_ included for privacy reasons.

AMENDED COMPLAINT          10

a.  On October 29, 2023, Mr. Leavitt sent his first email, notifying Central Credit of his request for a re-investigation and that there were injuries and losses resulting from the reporting.   Notably, the only negative reporting are the ones shown above. Importantly, the Baha Mar negative reporting was not purportedly in existence until November 1, 2023, so this notification could _only_ have pertained to the Atlantis / Brookfield Account.

b.  On October 30, 2023, Mr. Leavitt followed up.  In his second email, Mr. Leavitt drew attention to his New Jersey state-court litigation against Atlantis.

c.  On November 2, 2023, Mr. Leavitt followed up again, and specifically requested that Central Credit furnish the checks that were signed to incur the debts and show evidence.  ("If I owe this money that you are slanderously telling others, please furnish me with the checks that I signed, and show me the evidence.").  An employee of Central Credit / Everi, Stephanie Contraras responded to this email stating "We are in receipt of your notice of dispute and will undertake investigation as permitted."  Mr. Leavitt understood that Central Credit would provide from Atlantis the check numbers. The significance of this is that when a casino issues a line of credit against a person, including against Mr. Leavitt, the casino will almost always require that the person (or at least in Mr. Leavitt's experience at various casinos around the world, will almost always require) that the person taking out the line of credit sign a check.  If the line of credit isn't paid, then the casino can simply deposit / cash the check.  So, the significance in the industry is that, in the ordinary course of business, any casino like Atlantis that says a customer hasn't paid would at least be able to demonstrate there was some financial instrument.  Mr. Leavitt understood that Ms. Contreras' email would mean that Central Credit would obtain the signed checks indicating which amount was unpaid with specificity, allowing Mr. Leavitt to prove that he had given

them good checks on his materials and paid them.  This would be known and understood by Central Credit because they operate in the casino industry. Accordingly, if the signed checks were produced, Mr. Leavitt could prove that he provided collateral to Atlantis and Atlantis either **(A)** simply never bothered to cash / deposit the check or **(B)** without a showing of the checks, that Atlantis could not identify any debts.

d.  On November 2, 2023, Mr. Leavitt again tried to communicate with Central Credit, emailing them again.  He received a message that he was blocked from contacting them.  A true and correct copy of this response is showing in **<u>Exhibit D.</u>**  As shown by the course of communications, Mr. Leavitt was proactive, he would have inquired repeatedly to know the check numbers, to demonstrate that he has never knowingly not paid a casino debt (and believes he has always paid them), that he was numerous witnesses to substantiate this, and to further explain why the Atlantis account could not be true unless and until they produced the signed checks to Central Credit.  Yet, because he was blocked, Mr. Leavitt understood that Central Credit wouldn't be taking further information from him, such that the blocking inhibited his ability to further and easily communicate with Central Credit, hampering his ability to communicate directly to Central Credit what to look for.

e.  Given the block, Mr. Leavitt tried another form of communication: in this communication: he mailed a letter.  A true and correct copy of the contents of this letter are shown in **Exhibit F**.  Critically, in this letter, Mr. Leavitt clearly expressed his dispute as to **(A)** the Atlantis / Brookfield false reporting and **(B)** the Baha Mar false reporting.  Moreover, Mr. Leavitt against requested the "checks from these casinos proving or showing I owe them money (which I do not) and they will not provide them."  Again, given that these casinos require patrons to provide signed

checks that they can cash upon non-payment, without a showing of these checks at issue, they cannot prove they were incurred. And, *if* these checks were shown, Mr. Leavitt could demonstrate that they were paid. As such, the failure to provide the checks is critical. Mr. Leavitt made this point repeatedly.

**E.    Failure to Reasonably Investigate Inaccuracy**

13. Although Central Credit in fact ultimately receive Plaintiff's communications (as Central Credit itself later confirmed), Central Credit did not conduct a reasonable investigation into Plaintiff's request for correction. Instead, Central Credit acted evasively and willfully attempted to skirt its statutory obligations to conduct reasonable investigations to ensure the accuracy of the credit information that it reports. For example, Central Credit, acting through one of its employees, simply blocked Plaintiff's email rather than work with him to discern the full nature and scope of its own inaccuracies and errors. Then, as allowance of discovery will show and on information and belief, after Plaintiff persisted, the full extent of Central Credit's investigation was unreasonable as it only amount to a simply request to the credit-reporting data furnishers as to whether it was accurate. Specifically, after Central Credit stopped evading Plaintiff's inquiry through egregious tactics such as blocking his email or acting disrespectfully toward him, Central Credit, on information and belief, made a *pro forma* request to its furnishers that was not a reasonable or good-faith attempt to obtain accuracy as to his credit report. For example, on information and belief, Central Credit made no meaningful attempt to discern the nature of the inaccuracy from Plaintiff. Furthermore, Central Credit, on information and belief, made no attempt to determine whether the gaming debts, even if incurred, were fully paid off and fully satisfied – to wit, fully paid off and fully satisfied prior to the reporting of the debts themselves. Given these failures, Central Credit

failed to either conduct a reasonable investigation or to correct the inaccurate information or remove it from Plaintiff's credit file in the required timeframe.

   a.  Notably, Central Credit conceded that Mr. Leavitt's dispute was *not* frivolous.  Under 15 U.S.C. § 1681i(a)(3), Central Credit can label a dispute as frivolous using certain procedure.  Central Credit did not avail itself of this option and did not provide the notice required.

   b.  Furthermore, Central Credit did *not* investigate with Baha Mar whatsoever, as discovery will demonstrate.  Mr. Leavitt has received the file on him from Central Credit and nothing therein contains any demonstration of any communication or attempt to investigation the $110,000 in false reporting on debts reported as to Baha Mar.  Thus, there was no investigation whatsoever as to Baha Mar.  And, a complete failure to investigate is not a reasonable investigation.  Indeed, as shown in **Exhibit A**, Central Credit discusses the Atlantis reporting but nowhere discusses anything to do with the Baha Mar reporting.  That's unreasonable.

   c.  Central Credit also did not conduct a reasonable investigation into the Atlantis account.  It never asked for the checks that would demonstrate the veracity of the reporting, as was repeatedly requested by Mr. Leavitt.  Moreover, it never asked for any documentation whatsoever and simply accepted a hearsay statement.  The communications and investigation are shown in a true and correct copy of emails in **Exhibit G**.

**F.**   **Willful Failure**

14.  Violations of the FCRA are deemed to have been done "willfully" if they were "knowing" violations or violations made with a "reckless disregard of the law."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 59 (2007).  At its essence, reckless behavior is behavior that poses a

"high risk of harm, objectively assessed[.]"   *Id.* at 69.   Affirmatively acting to block communications with a consumer to avoid fulfilling credit-reporting investigation and obligations imposed by statute is willful behavior or at least a reckless disregard for reasonable investigations.   That's what Central Credit did.   Then, when Plaintiff persisted, on information and belief, it merely inquired whether the debt was incurred, but never whether it was paid. By analogy, this is akin to foreclosing on a fully paid-off home on the rationale that a mortgage was at some point on the house, even though that mortgage was fully paid off.   Central Credit was not structured or attempting to seriously fulfill its obligations, but rather, on information and belief, instructs and trains its employees to do as little as possible in complying with the law, rather than recognizing that its reporting has massive implications on the lives of those it reports on and, as such, it acts in ways that have a high risk of harm, such as by systematically failing to conduct investigations that would meaningfully resolve disputes and correct credit reports out of court.   This is especially egregious because there was no investigation as to one of them; no request for the checks was identify the purported accounts; no follow-up communications to clarify matters if they were misunderstood.

### G.   Negligent Failure (in the alternative)

15.   In the alternative, even if the above is not willful or reckless conduct in violation of the credit-reporting laws, it is at least unreasonable and negligent to block a consumer trying to dispute their credit, to do such an unreasonable investigation that it makes no serious attempt to determine if, as a matter of fact, that the amount was actually paid.   Accordingly, these violations were at least negligent.

### H.   Actual Damages

16.   Plaintiff has suffered actual injury and damages caused by and as a result of Central Credit's failure to conduct a reasonable investigation.   While this factually inaccurate and misleading

information was on Central Credit's own credit report prepared as to Plaintiff, Central Credit, on information and belief that will be established through further discovery, disseminated this false credit information to various gaming companies, including MGM Casino Properties, Station Casino Properties, Caesars Entertainment Properties, and other gaming properties. These credit reports then damaged Plaintiff in an especially harmful manner because Plaintiff has exceptional talents and is able to make money through gambling and gaming.  Yet, the false credit reports resulted in credit lines at various and major gaming locations to restrict his access to credit.  Accordingly, he was unable to make as much money.  Moreover, his reputation was harmed and this reputational harm was caused, on information and belief, he had lesser access to money-making opportunities as a result of it.  Moreover, this experience has been tremendously psychologically harmful, devastating, stressful, *etc.* to plaintiff.  The stress of being told that he owes significant sums of money that he has already paid, of being disrespected as he tries to correct it, and facing significant delays in the correction.  All of these cause actual damages to Plaintiff, in amounts to be determined at trial.

## II.    FAILURE TO NOTIFY CONSUMER OF RIGHT TO KNOW PROCEDURES USED AND OF RIGHT TO INCLUDE STATEMENT OF DISPUTE, 15 U.S.C. § 1681i(a)(6)(B)(iii)-(iv)

17.    Defendant willfully, recklessly, and negligently violated 15 U.S.C. 1681i(a)(6)(B) by failing to provide the required statements set forth expressly by statute to Plaintiff in its letter to him. Specifically, Defendant's November 2023 letter did not include notification that Plaintiff had a right to know the procedure that Defendant used in conducting the reinvestigation and that Plaintiff also had a right to include a statement of dispute.  As a result of these deficiencies, Plaintiff also suffered damages.

1

2
**A.**     **Consumer**

18.  Mr. Leavitt is a "consumer," as defined by the FCRA.  Specifically, the FCRA defines a

3
"consumer" to mean an "individual."  15 U.S.C. § 1681a(c).  Mr. Leavitt fits the bill.  He is a

4

5
natural, individual human being—not an artificial person such as a corporate or limited-

liability entity.  As an individual natural person, Mr. Leavitt is the type of person within the

6

7
ambit of the FCRA's protections, that FCRA was intended to protect, and is imbued with

statutory authority to bring civil actions for noncompliance with the FCRA's provisions.  *See*

8

9
15 U.S.C §§ 1681n, 1681o.

10

11
**B.**     **Consumer Reporting Agency**

19.  Central Credit LLC is a "consumer reporting agency," as defined by the FCRA.  Specifically,

12

13
the FCRA defines a "consumer reporting agency" (or "CRA") to mean "any person which,

14
for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in

15
part in the practice of assembling or evaluating consumer credit information or other

16
information on consumers for the purpose of furnishing consumer reports to third parties, and

17
which uses any means or facility of interstate commerce for the purpose of preparing or

18

19
furnishing consumer reports."  15 U.S.C. § 1681a(f).

20
a.  Central Credit is a person.  In legal contexts, as here, the word "person"  includes

21
"corporations, companies, associations, firms, partnerships, societies, and joint stock

22
companies, as well as individuals."   1 U.S.C. § 1.   Central Credit is Delaware-

23
incorporated corporation and company and, as such, is a person as that term is

24
understood under the law.

25
b.  A substantial part of Central Credit's business is the assembly or evaluation of credit

26

27
information on consumers.  Specifically, for decades, Central Credit has been

28
providing computerized consumer reporting regarding the creditworthiness of casino

clients and casino patrons. Central Credit assemblies the information by acting as a data purchaser from other CRAs, such as Experian and TransUnion. Information collected includes bankruptcy, assets, income, debts, *etc*. Then, Central Credit evaluates the information itself that it assembles and then produces consumer reports on these consumers.

c. Central Credit assembles and collects this information for the purpose of providing this information to third parties. It does not do so solely for its own internal acquisition and retention of the information. Rather, it's business strategy and structure is the provision of this information to third parties, like casino and other gambling operations.

d. Central Credit does not do so for free. Rather, as discovery will demonstrate, it charges some form of payment or monetary dues for its credit reports.

e. Central Credit uses a means and facility of interstate commerce in providing these materials. For example, as discovery will demonstrate, Central Credit uses the Internet and interstate telephones to both arrange for, assemble, evaluate, create, and distribute its credit reports. Thus, Central Credit is a consumer reporting agency as that term is defined in the FCRA.

## C.    Inaccurate Information in Consumer File

20. Central Credit placed inaccurate and/or incomplete information in Plaintiff's credit file or credit report. Specifically, Plaintiff was gaming at two casino or gaming locations located in the Bahamas. Although Plaintiff incurred gaming debts while gaming there, Plaintiff paid them off in their entirety through a combination of cash and gambling chips before leaving these gaming locations each time. The locations in the Bahamas used a tablet computer, somewhat like an iPad, to register the payment and that payment was so registered in that

manner before Plaintiff left.  So, although debts were incurred at these gaming locations, they were immediately paid off in full, fully satisfied, and was not owed as such.  Nonetheless, Central Credit included they amounts on its version of Plaintiff's credit report as an unpaid gambling debt.  Because it reported these amounts as unpaid gambling debt when they were, in fact, fully paid and fully satisfied, Central Credit's consumer report on Plaintiff contained inaccurate and incomplete information.  Moreover, because these were significant and material amounts that were falsely, incorrect, inaccurate, and incompletely reported as not paid off in full, these had a significant and material impact upon the view of the credit reporting.  Central Credit included this false — and materially and significantly false — information in its consumer reports on Plaintiff and then distributed them on various occasions, including on or around October 15, 2023, to a number of gaming locations including MGM Casino Properties, Station Casino Properties, Caesars Entertainment Properties, and other casino, gambling, and gaming establishments – as to be determined in discovery.  These inaccuracies can and did affect credit decisions because they showed massive arrears on debt when, in fact, those debts had been paid in full almost immediately after they were incurred.  In short, there was blatant factual inaccuracy of the kind that can and did profoundly affect credit decisions, as detailed further below.

### D.    Direct Notification of Dispute

21.    On or around, October 28, 2023, Plaintiff notified Central Credit regarding the inaccurate and incomplete information.  Plaintiff informed Central Credit that this information was false and requested that Central Credit correct this information by removing the non-payment and falsely reported debt from his gaming credit report.  As Plaintiff will show, he made multiple communications requesting correction.  By personally initiating these communications and being involved in all of them, Plaintiff communicated these directly, using his emails, *etc.*

AMENDED COMPLAINT                    19

**E.**     <u>Failure to Notify Consumer of Rights to Know Investigation Procedure</u>

22.   The FCRA sets forth a clear procedure for what CRAs like Central Credit must do after conducting a reinvestigation. In fact, it provides a clear list that can be simply repeated every time a reinvestigation is completed. Specifically, the FCRA sets forth six requirements for the letter that a CRA must send after completing a reinvestigation. Those requirements are set forth in 15 U.S.C. 1681i(a)(6)(B)(i)-(v).

23.   Central Credit sent Plaintiff a November 21, 2023, letter after completing its investigation.

24.   The November 21, 2023, letter does state that the re-investigation is completed.

25.   The November 21, 2023, letter does provide an attached copy of Central Credit's (erroneous) consumer report about Mr. Leavitt.

26.   However, the November 21, 2023, letter does <u>*not*</u> provide any "a notice that, if requested by the consumer, a description of the procedure used to determine the accuracy and completeness of the information shall be provided to the consumer by the agency, including the business name and address of any furnisher of information contacted in connection with such information and the telephone number of such furnisher, if reasonably available[.]" *See* 15 U.S.C. § 1681i(a)(6)(B)(iii).

     a.   Specifically, the November 21, 2023, letter has no statement to this effect. Nothing in the letter indicates any right of Mr. Leavitt to request details of the procedure that Central Credit undertook in order to determine the accuracy and/or completeness of the information in its own credit report.

     b.   Likewise, the November 21, 2023, letter has an attached "Summary of Rights" and even in this fine print there is no statement to this effect. Nothing in the "Summary of Rights" attachment indicates any right of Mr. Leavitt to request details of the procedure that Central Credit undertook in order to determine the accuracy and/or completeness of the information in its own credit report.

c.  Nor did any of the other materials that Central Credit sent in response to the inaccuracies and errors in its credit report identified on or around the fall of 2023 (*i.e.*, October and November) so identify it.

d.  Mr. Leavitt was not personally aware of the right to request details of the procedure and did not knowledge of such rights.  Had he read a proper notification from Central Credit as required by statute, he would have exercised such rights and, upon receiving detailed information about the procedures, would have provided further information tailored to the portions of Central Credit's procedures in order to correct the errors.

27. Furthermore, November 21, 2023, letter does <u>*not*</u> provide any "notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the information[.]"  *See* 15 U.S.C. § 1681i(a)(6)(B)(iv).

a.  Specifically, the November 21, 2023, letter has no statement to this effect.  Nothing in the letter indicates any right of Mr. Leavitt to include a statement of dispute – let alone in his own words or those of a trained attorney disputing the errors in the credit-reporting.

b.  Likewise, the November 21, 2023, letter has an attached "Summary of Rights" and even in this fine print there is no statement to this effect.  Nothing in the "Summary of Rights" attachment indicates any right of Mr. Leavitt to include a statement of dispute as to the credit reporting.

c.  Nor did any of the other materials that Central Credit sent in response to the inaccuracies and errors in its credit report identified on or around the fall of 2023 (*i.e.*, October and November) so identify it.

d.  Mr. Leavitt was not personally aware and did not know of his right to request details of the procedure and did not knowledge of such rights.  Had he read a proper notification from Central Credit as required by statute, he would have exercised such

AMENDED COMPLAINT                                   21

rights and, upon receiving detailed information about the procedures, would have provided further information tailored to the portions of Central Credit's procedures in order to correct the errors.

28. A true and correct copy of the November 21, 2023, letter is attached to this Complaint as **<u>Exhibit A</u>**.  A true and correct copy of the "Summary of Rights" attached to the November 21, 2023, letter is attached to this Complaint as **<u>Exhibit B</u>**.  Central Credit also provided a copy of its erroneous credit report (which is *<u>not</u>* attached for privacy reasons), but it does not include any statements of any kind that provide or intimate at any rights of the consumer under federal law.

29. As a result, none of the materials provided in response to Mr. Leavitt's requests for reinvestigation at issue in this case – not the November 21, 2023, letter and not any attachments thereof (nor any materials or emails) – properly notified Mr. Leavitt of his rights and, therefore, those failures constitute violations of the FCRA.

## F.    <u>Willful Failure</u>

30. Violations of the FCRA are deemed to have been done "willfully" if they were "knowing" violations or violations made with a "reckless disregard of the law."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 59 (2007).  At its essence, reckless behavior is behavior that poses a "high risk of harm, objectively assessed[.]"  *Id.* at 69.  Here, the failure was reckless.  Coupled with the fact that Central Credit, through an employee, blocked Plaintiff from communicating his disputes, this is, on information and belief, a willful failure by Central Credit here.  It is especially willful insofar as the requirements are spelled out concretely and directly in the statute itself and so, it is reckless and objectively risky for consumer rights in their credit profiles to simply exclude it when even the most rudimentary understanding or perusal of the statute would lead to successful understanding of it and compliance.

31.   Notably, in late 2020, Mr. Leavitt learned that a separate casino – the Viejas Casino – had attempted to cash / deposit a fraudulent check.  Mr. Leavitt was informed when his bank flagged the attempted deposit of the check because the check had not been signed by Mr. Leavitt.  The bank contacted Mr. Leavitt and he confirmed that he had not authorized such payment, so the bank rightfully and correctly refused to honor the false check

32.   A true and correct image of the unsigned check and Viejas generated and tried to cash / deposit is show below:



33.   Later, when Mr. Leavitt tried to obtain lines of credit at other casinos, this false and fraudulent balance came up.  Because the purported balance was only $10,000, most casinos would still extend lines of credit, but when one casino group – Caesars – refused to continue to extend lines of credit to Mr. Leavitt, he decided that he had to take action.  He could not directly sue the tribe.  (The Viejas casino was not subject to suit because it is a tribal entity and so have tribal sovereign immunity against a suit by Mr. Leavitt, or at least he so understood that they would have tribal immunity.  A police report was written about the Viejas Casino's actions with respect to this false check and from the police report, Mr. Leavitt understood that Viejas was involved in a criminal action).

34.    In order to correct this error and inaccuracy on his gaming credit report, Mr. Leavitt contacted Defendant Central Credit to request a re-investigation.  Mr. Leavitt received a notice of that the reinvestigation was complaint.  A true and correct copy of this February 3, 2021, letter regarding the Viejas dispute is attached to this Complaint as **Exhibit C** (with an **Exhibit D** "Summary of Rights").  Notably, this letter shows that Central Credit was aware of the obligation, and had provided, on a prior occasion the required statement about an ability to include a statement of dispute: "You have a right to add a statement to your file disputing the accuracy or complete of the information."  This inclusion in the February 2021 letter demonstrates that Central Credit was aware of the requirement in some form.  Yet, its exclusion from the November 2023 letter is actionable and the inclusion in prior letters permits the inference that this was willful, an inference bolstered by an employee's decision to block Mr. Leavitt's email account.  Accordingly, as discovery will demonstrate, this exclusion was intentional and specifically done because Central Credit was concerned that Mr. Leavitt would include a statement of dispute and did not want Mr. Leavitt to do so.

35.    Notably, the 2021 Viejas Casino's false charge of $10,000 was eventually removed from the credit report.  Mr. Leavitt did _not_ pay the $10,000 because he did not owe it.  Nonetheless, it was removed, indicating that either Viejas recognized this was incorrect / false / fraudulent reporting on its part _or_ that Central Credit believed so.  On information and belief, the Viejas Casino removed the account reporting or, alternatively, allowed it to lapse, so further efforts by Mr. Leavitt were not necessary.

36.    Ultimately, Mr. Leavitt did not recall fine print in the February 2021 letter about rights to include a statement of dispute.  He had no need to.  The statute obligates Central Credit to provide it in every notice of results of a reinvestigation.  15 U.S.C. 1681i(a)(6)(B).  Had Central Credit done so in the November 21, 2023, letter Mr. Leavitt would have exercise those rights.

37. To clarify because the Honorable Court noted that the prior complaint was not a model of clarity, no notice of the results of reinvestigation, or anything attached thereto, or any other communication from Central Credit to Mr. Leavitt noted a right to know the procedure used to determine accuracy and complete of reporting.  *See* Exhibits A-C; 15 U.S.C. § 1681i(a)(6)(B)(iii).  Moreover, no notice of the results of reinvestigation or anything attached thereto for the November 21, 2023, results of the reinvestigation notified Mr. Leavitt of his rights to include a statement of disputes.  *See* Exhibits A-B; 15 U.S.C. § 1681i(a)(6)(B)(iv).  Indeed, the fact that the February 3, 2021 letter (Exhibit C) included a statement of dispute supports the findings of willfulness / negligence because it shows that Central Credit knew how to do so in other notices but failed to do so here, which supports that this was not an administrative mistake, especially because the February 3, 2021 letter would be available to the persons writing in response to Mr. Leavitt about the October / November 2023 disputes about Baha Mar and Atlantic / Brookfield.  Central Credit simply failed to comply with both statutory requirements in its November 21, 2023 notice of results of reinvestigation (both the letters and the attachments).  It nowhere provided Mr. Leavitt with the required notice that it was required to so in November 2023.

### G.    Negligent Failure (in the alternative)

38. In the alternative, the failure to comply with the FCRA in this regard is at least negligent and unreasonable, especially because these statutory requirements are made explicitly and expressly clear on the face of the statute in clear language.

### H.    Actual Damages

39. Had Plaintiff been informed of these rights in the November 2023 letter or attached Summary of Rights, Plaintiff would have taken advantage of and exercised his right.  Indeed, the sums involved in the false reporting from the Atlantis Casino ($75,000) and the Baha Mar Casino

($110,000) were significantly higher than false reporting from the Viejas Casino ($10,000), such that Mr. Leavitt's lines of credit at all kinds of casinos were at stake. Mr. Leavitt reviewed the materials submitted more thoroughly from Central Credit in the November 21, 2023, letter and its attachments because he was concerned that the much larger reporting of unpaid balances would affect his livelihood significantly. Accordingly, Mr. Leavitt would have noticed the statements of his rights had Central Credit included the materials, either the right to dispute and/or the right to demand greater details. And, given the stakes of such reporting on his casino lines of credit so essential to his livelihood, he would have exercised these rights by include a thorough statement of review, possibly retaining a lawyer to assist him in the statement of dispute), demanding information about the procedures and processes, and then supplementing any investigation undertaken by Central Credit with more information that would assist.

40.   Moreover, the exercise of these rights would have limited the injuries that Plaintiff suffered. Plaintiff has suffered actual injury and damages caused by and as a result of Central Credit's failure to conduct a reasonable investigation. While this factually inaccurate and misleading information was on Central Credit's own credit report prepared as to Plaintiff, Central Credit, on information and belief that will be established through further discovery, disseminated this false credit information to various gaming companies, including MGM Casino Properties, Station Casino Properties, Caesars Entertainment Properties, and other gaming properties. These credit reports then damaged Plaintiff in an especially harmful manner because Plaintiff has exceptional talents and is able to make money through gambling and gaming. Yet, the false credit reports resulted in credit lines at various and major gaming locations to restrict his access to credit. Accordingly, he was unable to make as much money. Specifically, without these lines of credit, he was unable to participate in the levels of gaming play wherein he could profit or significantly profit because, *inter alia*, he needs to be able to access the lines of credit

to get chips and case them in.  Moreover, his reputation was harmed and this reputational harm was caused, on information and belief, he had lesser access to money-making opportunities as a result of it.  Moreover, this experience has been tremendously psychologically harmful, devastating, stressful, *etc.* to plaintiff.  The stress of being told that he owes significant sums of money that he has already paid, of being disrespected as he tries to correct it, and facing significant delays in the correction.  All of these cause actual damages to Plaintiff, in amounts to be determined at trial.  Yet, had Plaintiff known that he has a point-blank statutory right to learn the precise contours of the abysmal excuse for a reinvestigation undertaken by Central Credit, he would have exercise the right and then, in light of this information, he would have been able to more quickly apprise Central Credit of the egregious failure points of the investigation and where they could correct it.  Had this happened, Central Credit either would have corrected its error promptly or it would have undertaken a better investigation that would have resulted in correction of the massively incorrect credit report.  Likewise, had Plaintiff known about his right to include a statement of dispute, he would have exercised this right and the fact that these were undisputed arrears on the credit report played a significant role, on information and belief, in the reputational, financial, credit-worthiness, and economic harms at issue here.  Mr. Leavitt estimates that these losses of lines of credit were more than tens of thousands of dollars.

41.    In sum, Mr. Leavitt was *not* notified in November 2023 about his rights to request information about the procedures used to investigate his claims and/or his rights to include a statement of dispute.  Had he received such notices, he would have exercised them and, after exercising those rights, he would have been able to access lines of credit at some or all of the casinos where he lost them, permitting him to use his gaming expertise to profit and to enjoy the experience of gaming.  Central Credit's misconduct barred that.

III.    **FAILURE TO REASONABLY INVESTIGATE DISPUTED CREDIT REPORTING, RCW 19.182.090(1), and to Provide Notice of Ability to Provide Statement of Dispute, RCW 19.182.090(8)(B)(v)**

42.    Defendant has violated the Washington Consumer Protection Act ("WCPA"), RCW 19.86.010, *et seq.*, by virtue of its violations of the Washington Fair Credit Reporting Act ("WFCRA"), RCW 19.182.005, *et seq.*    Specifically, Defendant failed to reasonably investigate the completeness or accuracy of incomplete or inaccurate information contained in Defendant's file on Plaintiff even after receiving notice of the disputed nature of that information.    *See* RCW 19.182.090(1).    Likewise, Defendant willfully, reckless, and/or negligently failed to provide notice of the consumer's right to file a statement in the consumer report disputing the credit reporting.

A.    <u>Unfair and Deceptive Practice</u>

43.    The first element of a Washington CPA claim is the requirement that there be an "unfair or deceptive act or practice[.]"    *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986); *see* RCW 19.86.093(1)-(3) ("unfair or deceptive acts or practices").    The WFCRA establishes that violations of the chapter are unfair or deceptive per se.    *See* RCW 19.182.150 ("A violation of this chapter is an unfair or deceptive act in trade or commerce and an unfair method of competition for the purpose of applying the consumer protection act, chapter 19.86 RCW.").    Central Credit has violated the WFCRA's substantive provisions and, accordingly, has by virtue of those violations committed unfair and deceptive trade practices *per se*.    The above allegations are reincorporated herein.

*i.    Consumer*

44.    As further detailed above and re-incorporated here, Mr. Leavitt is an individual, so he is a consumer.    *See* RCW 19.18.010(3).

### ii. *Consumer Reporting Agency*

45.   As further detailed above and re-incorporated here, Central Credit a person who, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the business of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and who uses any means or facility of commerce for the purpose of preparing or furnishing consumer reports. Accordingly, Central Credit is a consumer reporting agency.  *See* RCW 19.180.010(5).

### iii. *Inaccuracy of Information in Consumer's File*

46.   As further detailed above and re-incorporated here, Central Credit prepared a consumer report about Plaintiff and included it in Plaintiff's file—with the inaccurate, incomplete, and incorrect information being the reporting of a debt as being in majorly in arrears when, in fact, the debt had been fully paid via cash and gambling tokens to the relevant casinos before Plaintiff left the casino.  This inaccuracy was so significant that major credit decisions can and were made regarding it.

### iv. *Direct Notification of Dispute*

47.   As further detailed above and re-incorporated here, Central Credit was directly notified by Plaintiff regarding the inaccuracy.

### v. *Failure to Reasonably Investigate Inaccuracy*

48.   As further detailed above and re-incorporated here, Central Credit did not reasonably investigate the disputed information.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   vi.   <u>*Failure to Provide Notice of Right to Provide Statement of Dispute*</u>

49.   As further details above and re-incorporated here, Central Credit failed to provide

   information regarding the Plaintiff's right to file a brief statement as authorized by RCW

   19.180.090(6)..

   vii.   <u>*Willful Failure*</u>

50.   As further details above and re-incorporated here, Central Credit failed to reasonably

   investigate and to provide a notice of these rights both willfully and recklessly.

   viii.   <u>*Negligent Failure (in the alternative)*</u>

51.   In the alternative, and as detailed above and re-incorporated here, Central Credit failure to

   reasonably investigate was itself unreasonable.

52.   Accordingly, Central Credit acted in a manner that is *per se* a deceptive and unfair by virtue

   of the WFCRA.  *See* RCW 19.182.150.


   **B. <u>Occurring in Trade or Commerce</u>**

53.   The second element of a Washington CPA claim is the requirement that the unfair or deceptive

   act or practice have occurred "in trade or commerce[.]"  *Hangman Ridge Training Stables v.*

   *Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986); *see* RCW 19.86.020 ("in the conduct of

   any trade or commerce"); RCW 19.86.020(2) (defining "'Trade' and 'commerce'").   As

   discussed above and re-incorporated here, Central Credit's assembly, evaluation, creation,

   dissemination, investigation, communications, *etc.*, were in interstate commerce, including

   Washington.   These acts were committed in commerce in a manner that both directly and

   indirectly affects residents of Washington, especially Plaintiff, and is directed at Washington.

AMENDED COMPLAINT                                        30

54. Moreover, as reasonable discovery will likely demonstrate, Defendants are not singling out Plaintiff. They are involved in mass-marketing emails to a broad swatch of consumers in the State of Washington.

## C. Adverse Public-Interest Impact

55. The third element of a WCPA claim is the requirement that the unfair or deceptive practice or act have adverse "public interest impact[.]" *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986). There are three ways to meet this third element under the WCPA. RCW 19.86.093(1)-(3). Defendant's acts and practices meet all three tests of injury to the public interest.

56. The first way to establish that an act or practice is injurious to the public is to demonstrate that the act or practice violates a separate Washington statute that "incorporates" the WCPA. RCW 19.86.093(1). The WFCRA incorporates the WCPA. RCW 19.182.150 ("A violation of this chapter is an unfair or deceptive act in trade or commerce and an unfair method of competition for the purpose of applying the consumer protection act, chapter 19.86 RCW."). Therefore, the WCPA's third element is met *per se* when the unfair or deceptive act or practice is itself a violation of the WFCRA. Here, Defendant has violated the WFCRA. Accordingly, the WCPA's third element of adverse public-interest impact is met by operation of law as to Defendant's WFCRA violations.

57. The second way to establish that an act or practice is injurious to the public interest is to show that the act or practice violates a statute with a "specific legislative declaration of public interest impact[.]" RCW 19.86.093(2). The WFCRA has specific legislative declarations of its public-interest importance. RCW 19.182.005 ("The legislature finds and declares that consumers have a vital interest in establishing and maintaining creditworthiness."); RCW 19.182.150 ("The legislature finds that the practices covered by this chapter are matters vitally

affecting the public interest for the purpose of applying the consumer protection act, chapter 19.86 RCW."). Thus, the WCPA's third element is met *per se* when the unfair or deceptive act or practice is itself a violation of the WFCRA. Here, Defendant has violated the WFCRA, establishing the WCPA's third element of adverse public-interest impact *per se*.

58. The third way to establish that an act or practice is injurious to the public interest is to show that adverse public-interest impact directly by showing the act or practice has (a) "[i]njured other persons;" (b) "had the capacity to injure other persons;" or (c) "has the capacity to injure other persons." RCW 19.86.093(3)(a)-(c). One such impact is sufficient. RCW 19.86.093(3) ("or"). Defendant's unlawful acts and practices meet all three factual tests of adverse public-interest impact listed in RCW 19.86.093(a)-(c):

    a. As further investigation and discovery will likely demonstrate, Defendant's acts and practices injured other persons.

    b. Defendant's acts or practices had the capacity to injure other persons.

    c. Defendant's acts or practices have the capacity to injure other persons.

### D. Injury to Business or Property

59. The fourth element of a WCPA claim is the requirement that there be "injury to plaintiff in his or her business or property[.]" *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986); *see* RCW 19.86.090 ("who is injured in his or her business or property"). As detailed above and re-incorporated here, Plaintiff has suffered significant damages in many respects. Importantly, Plaintiff has a commercial and business interest in his ability to get financial at gaming and casino locations it itself injury to Plaintiff's profession and trade. Moreover, Plaintiff's inability to access capital, his depletion of ability to conduct his business were harmed. Moreover, Plaintiff has a legally cognized property interest in the nature of his report itself, even though it was created by Central Credit. Plaintiff

has a cognizable property interest in its accuracy as well and in the reputational and professional interests in his professional image as well. All of these were harmed by the dissemination of a patently false report.

### E. Causation of Injury

60.    The fifth element of a Washington CPA claim is the requirement of "causation"—i.e., the requirement that the injury is caused by the unfair or deceptive practice or act. *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986); see RCW 19.86.090 ("actual damages sustained by him or her"). The injuries described above were caused by the inaccuracy, as further detailed above and re-incorporated here. Moreover, the injuries would have been lessened by a provision of notice regarding Plaintiff's rights because Plaintiff would have exercised them.

## PRAYER FOR RELIEF

61.    Plaintiff prays for actual damages, punitive damages, statutory damages, trebling of damages, costs, fees, and injunctive relief, among all other relief available in law and equity, pursuant to both the FCRA, the WFCRA, and the WCPA.

## JURY DEMAND

62.    A jury trial is hereby demanded by all Plaintiffs as to all issues so triable.

Date: October 2, 2025                        Respectfully submitted,

                                            **DIGITAL JUSTICE FOUNDATION**
                                            A NONPROFIT, PUBLIC-INTEREST FIRM

                                            By */s/ Andrew Grimm*
                                               Andrew Grimm (WSBA 51486)
                                               DIGITAL JUSTICE FOUNDATION
                                               15287 Pepperwood Drive
                                               Omaha, Nebraska 68154
                                               (531) 210-2381

AMENDED COMPLAINT                                33

Andrew@DigitalJusticeFoundation.org

## CERTIFICATE OF SERVICE

I certify that the foregoing has been served via **electronic filing** via this Court's CM/ECF system.

DATED: October 2, 2025                    Respectfully submitted,

*/s/ Andrew Grimm*
Andrew Grimm